*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2419**

Mark W. Tibbals,
Appellant,

vs.

Kerry G. Tibbals,
Respondent.

**Filed October 14, 2014
Affirmed in part, reversed in part, and remanded
Hooten, Judge**

St. Louis County District Court
File No. 69DU-CV-11-4088

Shawn B. Reed, Maki & Overom, Ltd., Duluth, Minnesota (for appellant)

Kerry G. Tibbals, Duluth, Minnesota (pro se respondent)

Considered and decided by Connolly, Presiding Judge; Johnson, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

Appellant challenges the district court's order denying his motion to appoint a receiver to sell certain homestead property for satisfaction of his judgment against respondent, arguing that respondent waived the homestead exception, the homestead exemption is inapplicable, and his contribution for labor and materials for the

improvement of the homestead falls within an exception to the homestead exemption. We affirm the district court's determination that respondent did not waive his homestead exemption and that, notwithstanding the malicious conduct of respondent, the homestead exemption applies. But, because appellant's contribution of materials for the improvement of the homestead falls within an exception to the homestead exemption, we reverse in part and remand for reconsideration of appellant's motion to appoint a receiver.

## FACTS

Appellant Mark Tibbals and respondent Kerry Tibbals are brothers. In 1999, Kerry leased certain real property in Duluth (the property) from its fee owner, Minnesota Power. The property included a house that was built around 1986. In 2004, Kerry obtained a mortgage on his leasehold interest in the property from James Bedore for the sum of $123,711.65. In September 2008, Mark lost his job in Texas and, with encouragement from Kerry and other family members, moved to live at the property. At that time, Kerry spent approximately one weekend per month at the property.

Mark agreed to make the monthly lease payments and pay taxes on the property. Within a month of Mark moving to the property, Kerry and Bedore needed money, so Bedore asked Mark for a $40,000 loan. Mark refused the loan request, but offered to pay off Kerry's mortgage on the property owed to Bedore. In return for Mark's payment of the outstanding balance of the mortgage, Kerry agreed that he would secure Mark's interest in the property. On December 17, 2008, Mark drafted, and Kerry signed, a revocable "Declaration of Trust" providing that, upon Kerry's death, Kerry's interest in the property would be assigned to Mark and Kerry's son in equal shares. In an

2

amendment to Kerry's lease agreement with Minnesota Power concerning the property, an agent of Minnesota Power consented to the assignment provisions of the trust.

Kerry moved back to the property permanently in February 2009. The parties performed extensive renovations on the property between 2009 and 2010, including replacing or improving the gravel driveway, windows, doors, electrical service, kitchen, insulation, siding, and drywall. Both Mark and Kerry actively participated in the planning and physical work of the renovations and intended to improve the property for their own enjoyment upon retirement or for possible resale. Mark alone paid for renovation materials and the hiring of construction contractors.

During the renovation period, in October 2009, Kerry amended the trust agreement to increase Mark's interest in the leased property from one-half to two-thirds. And as part of the amendment, Kerry agreed to "waive[] [his] right to occupy [the] property for life, rent free and without charge" due to Mark's payment of "taxes, lease, maintenance, remodeling costs and expenses to hold and improve [the] property." Kerry also agreed to sell the property "at any given time to satisfy indebtedness to Mark" and "to reimburse Mark . . . half of the lease, taxes, utilities, groceries and living expenses from trust inception to date of sale."

The parties' relationship deteriorated, and Kerry revoked the trust and amendment in August 2010 without informing Mark. Mark and Kerry continued to renovate the property after the trust revocation. After Mark learned of the revocation, the parties signed another agreement in October 2010. Under this agreement, the property was to be listed for sale by May 1, 2011, and Kerry was to receive $130,000 from the sale with

3

Mark receiving the remainder of the proceeds. The parties also agreed that this agreement would be null and void if Mark was "compensated to his satisfaction prior to the sale of the property, for monies he spent on property improvements."

The property was never listed for sale. Mark moved back to Texas in December 2010 and offered to buy out Kerry's interest in the property. Kerry refused. Mark sued Kerry for breach of contract, unjust enrichment, and fraud. Following a bench trial in December 2012, the district court determined that the parties agreed that, in exchange for a secured interest in the property, Mark was to satisfy the Bedore mortgage and to pay for renovations on the property and Kerry's living expenses for a certain time period. The district court determined that this contract was to be enforced through the trust and its amendment and the agreement to list the property for sale, and that the contract was breached when Kerry revoked the trust, failed to list the property for sale, and failed to provide Mark with a secured interest in the property. But the district court concluded that Mark had "not proven by a preponderance of the evidence that the parties had an agreement that [Mark] would be paid for his labor on the property." Accordingly, the district court ordered the entry of judgment in the amount of $288,736.88 to compensate Mark for his payment of the Bedore mortgage, the total cost of renovation materials and labor, and Kerry's living expenses from February 2009 to September 2010.

The district court found that Kerry's "conduct was not merely negligent or reckless," but was "willful" and "malicious, in that he deliberately targeted" Mark and "intended to unjustly enrich himself." Concerned with the possibility that Kerry may attempt to evade the judgment through bankruptcy, the district court declared a

4

constructive trust in favor of Mark on Kerry's interest in the property. The district court "[did] not believe it can force the sale of the property at issue, as the property represents [Kerry's] homestead." But the district court noted that Mark would "have a secured interest in the property from which he may be able to collect the judgment in his favor."

Mark moved the district court to appoint a receiver to sell the property for satisfaction of the judgment. The district court denied the motion, reasoning that although "the law may allow the appointment of a receiver," "it does not allow for the forced sale of [Kerry's] homestead." Mark appeals.

## D E C I S I O N

In his appeal, Mark challenges the district court's denial of his request for a receiver. Mark claims that his equitable rights under the constructive trust cannot be adequately vindicated unless a receiver is appointed so that he can obtain recovery of his judgment against Kerry through the sale and seizure of the homestead. In considering Mark's claims, we note that the district court ruled that Mark had a constructive trust on Kerry's interest in the homestead, and Kerry has not appealed this determination.

A constructive trust is a judicially created equitable remedy imposed to prevent unjust enrichment of a person holding property under a duty to convey it or use it for a specific purpose. *Wright v. Wright*, 311 N.W.2d 484, 485 (Minn. 1981). Constructive trusts may be imposed when the court is persuaded "by clear and convincing evidence that the imposition of a constructive trust is justified to prevent unjust enrichment." *In re Estate of Eriksen*, 337 N.W.2d 671, 674 (Minn. 1983). As an equitable remedy, courts are not "bound by a formula" when finding a constructive trust. *Freundschuh v.*

5

*Freundschuh*, 559 N.W.2d 706, 711 (Minn. App. 1997) (citing *Knox v. Knox*, 222 Minn. 477, 481, 25 N.W.2d 225, 288 (Minn. 1946)). Courts are instead "free to effect justice to avoid unjust enrichment according to the equities." *Id.*

"The appointment of a receiver is made by a court of equity, and its purpose is to accomplish, as far as practicable, complete justice for the parties before it." *Asleson v. Allison*, 188 Minn. 496, 499, 247 N.W. 579, 580 (1933). "Its object is to secure and hold all property so that it may be available for the application of the final judgment." *Id.* at 499–500, 247 N.W. at 580. "Appointment of a receiver is within the discretion of the [district] court." *Minn. Hotel Co., Inc. v. ROSA Dev. Co.*, 495 N.W.2d 888, 891 (Minn. App. 1993). "[A] district court abuses its discretion if it acts against logic and the facts on record, or if it enters fact findings that are unsupported by the record, or if it misapplies the law." *In re Adoption of T.A.M.*, 791 N.W.2d 573, 578 (Minn. App. 2010) (quotation and citation omitted).

"A limited or general receiver may be appointed . . . after judgment to carry the judgment into effect, to preserve property pending an appeal, or when an execution has been returned unsatisfied and the judgment debtor refuses to apply the property in satisfaction of the judgment." Minn. Stat. § 576.25, subd. 3 (2012). "A receiver may be appointed in other cases as are provided by law, or in accord with existing practice, except as otherwise prescribed." *Id.*, subd. 6 (2012). "The judge may appoint a receiver of the debtor's unexempt property, or forbid a transfer or other disposition thereof, or any interference therewith, until further order therein." Minn. Stat. § 575.05 (2012). "Our statute defines certain cases wherein a receiver may be appointed. . . . They are not,

6

however, exclusive, and the court may under its general equity powers appoint receivers in other cases in accordance with the existing practice." *Asleson*, 188 Minn. at 499, 247 N.W. at 580 (citation omitted).

## I.

Mark argues that the district court erred as a matter of law in concluding that a receiver could not proceed against Kerry's interest in the real property because of Kerry's homestead exemption. The homestead exemption is "a constitutional right as well as a statutory right." *Argonaut Ins. Co. v. Cooper*, 261 N.W.2d 743, 744 (Minn. 1978). Under Minn. Const. art. I, § 12:

> A reasonable amount of property shall be exempt from seizure or sale for the payment of any debt or liability. The amount of such exemption shall be determined by law. Provided, however, that all property so exempted shall be liable to seizure and sale for any debts incurred to any person for work done or materials furnished in the construction, repair or improvement of the same, and provided further, that such liability to seizure and sale shall also extend to all real property for any debt to any laborer or servant for labor or service performed.

The Minnesota Statutes provide:

> The house owned and occupied by a debtor as the debtor's dwelling place, together with the land upon which it is situated . . . , shall constitute the homestead of such debtor and the debtor's family, and be exempt from seizure or sale under legal process on account of any debt not lawfully charged thereon in writing, except such as are incurred for work or materials furnished in the construction, repair, or improvement of such homestead, or for services performed by laborers . . . .

Minn. Stat. § 510.01 (2012).

7

In support of his argument, Mark first contends that Kerry expressly waived his homestead right under the revocable trust amendment when he agreed to "waive[] [his] right to occupy [the] property for life, rent free and without charge as Mark . . . [was] paying taxes, lease, maintenance, remodeling costs and expenses to hold and improve [the] property." "[T]he owner of a homestead may waive his homestead rights, even though they be constitutional rights, by an act which evidences an unequivocal intention to do so." *Argonaut Ins. Co.*, 261 N.W.2d at 744. But, Kerry revoked the trust and amendment containing the waiver provision. And the subsequent agreement the parties made to list the property for sale does not contain any language that could be construed as a clear and unequivocal waiver of Kerry's homestead rights. Based upon Kerry's revocation of the trust and the absence of any other subsequent agreements setting forth a waiver of Kerry's homestead exemption, we agree with the district court that there was no clear and unequivocal waiver of Kerry's right to a homestead exemption.

Mark also contends that Kerry implicitly waived his right to the homestead exemption through his fraudulent and malicious conduct in violation of the Minnesota Uniform Fraudulent Transfer Act (MUFTA). But "[a] reviewing court must generally consider only those issues that the record shows were presented and considered by the [district] court in deciding the matter before it." *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (quotation omitted). Before the district court, Mark failed to make any arguments based on the MUFTA. And the district court did not discuss any MUFTA claims in its order denying Mark's motion. Accordingly, we do not consider Mark's argument based on the MUFTA.

8

## II.

Mark argues that the homestead exemption is inapplicable in light of Kerry's malicious conduct and that the district court erred by not ordering the sale of Kerry's homestead—the property—to satisfy the constructive trust. We disagree.

In *Shearer v. Barnes*, an employee used company funds to purchase property that became the family homestead. 118 Minn. 179, 184–85, 136 N.W. 861, 862–63 (1912). The supreme court held that homestead property can be subject to a constructive trust, stating that "the question of the existence of a constructive trust is entirely unaffected by the use which a trustee ex maleficio makes of the property." *Id.* at 197, 136 N.W. at 867. But the *Shearer* court did not address whether the district court may appoint a receiver to sell the homestead property despite the homestead exemption, noting only that "it is entirely possible that upon a final adjustment of accounts . . . , and the final settlement of the receivership, the defendants' home may be left untouched, or at least preserved from sale, subject to a charge or lien." *Id.* at 198, 136 N.W. at 868.

The supreme court reached the issue in *Am. Ry. Express Co. v. Houle*, 169 Minn. 209, 210 N.W. 889 (1926). There, a husband embezzled money from his employer and used the money "for the construction of [a] dwelling." 169 Minn. at 210–11, 210 N.W. at 889. After construction was complete, the husband and his wife lived together at the house. *Id.* at 212, 210 N.W. at 890. The employer sought, and the district court granted, the appointment of a receiver to sell the land and the house held in trust for the employer. *Id.* at 211, 210 N.W. at 889. The supreme court stated, "The rule is well established that, where a constructive trust of embezzled funds comes into being for the protection of an

injured party, it is not cut off by any transfer of the property or of other property substituted therefor until such property reaches the hands of a bona fide purchaser for value." *Id.* at 213, 210 N.W. at 890. The supreme court affirmed, reasoning that "[t]he polluted funds were used in payment for work and material furnished in the construction of the dwelling, and the homestead, if such it became, would not be exempt from seizure or sale to satisfy such indebtedness." *Id.* at 212–13, 210 N.W. at 890.

Here, the district court rejected Mark's reliance on *Am. Ry. Express*, reasoning in part that "while [Kerry] acted in an unethical manner during 2008–2010, his actions did not rise to the level of embezzlement." Although factually different, the district court found instructive the principle stated in *Denzer v. Prendergast*:

> The decisions of this court reflect a disposition to protect the person claiming homestead exemption as against those asserting the right to reach his assets in satisfaction of claims. A creditor is entitled in justice to be paid, and this is true whether his judgment be based on contract or on tort. The homestead exemption law does not relieve one from his moral and legal obligation to pay what he owes. But experience has taught that in the long run obligations are more likely to be fulfilled by those whose connections with the community are stabilized by a protected interest in a relatively permanent place of abode than by those not so anchored.

267 Minn. 212, 216, 126 N.W.2d 440, 443 (1964).

Mark contends that the district court erred by determining that Kerry's conduct did not rise to the level of embezzlement. Mark cites *Black's Law Dictionary*, 468 (5th ed. 1979), which defines embezzlement as "willfully to take, or convert to one's own use, another's money or property, *of which the wrongdoer acquired possession lawfully*, by reason of some office or employment or position of trust." (Emphasis added).

10

But before the district court, Mark asserted in his memorandum in response to Kerry's objection to the appointment of a receiver that "the funds in this case were not embezzled." Mark cannot now argue that Kerry embezzled funds. *See Thiele*, 425 N.W.2d at 582. Moreover, under his own definition of embezzlement, Mark fails to establish that Kerry committed embezzlement. Although Kerry used his position of trust to encourage Mark to pay the Bedore mortgage and to pay for the renovations and Kerry's living expenses, Mark paid for these items directly, and Kerry never "acquired possession" of Mark's money before the payments.

Mark also contends that this case is analogous to *Am. Ry. Express* because, "[b]ut for [his] relationship, his money, and his investment, [Kerry] would not have the [p]roperty." But it is undisputed that Kerry acquired the lease of the property in 1999, almost a decade before Mark moved in, paid off the Bedore mortgage, and paid for the renovations and Kerry's living expenses. And in *Am. Ry. Express*, the inapplicability of the homestead exemption was based on the determination that "[t]he polluted funds were used in payment for work and material furnished in the *construction of the dwelling*." 169 Minn. at 212–13, 210 N.W. at 890 (emphasis added). The supreme court noted that "[t]he very claim of a homestead in this property is a breach of the trust which arose out of the manner of its *acquisition*." *Id.* at 213, 210 N.W. at 890 (quoting *Shearer*, 118 Minn. at 197, 136 N.W. at 868) (emphasis added and quotation marks omitted). Accordingly, *Am. Ry. Express* does not govern this situation, in which polluted funds were not used to acquire homestead property, but were used to improve the property. Mark is effectively asking us to extend *Am. Ry. Express* in contravention of the

11

homestead-exemption rule for policy reasons. But "the task of extending existing law falls to the supreme court or the legislature, . . . it does not fall to this court." *Tereault v. Palmer*, 413 N.W.2d 283, 286 (Minn. App. 1987), *review denied* (Minn. Dec. 18, 1987). And "[b]ecause this court is limited in its function to correcting errors it cannot create public policy." *LaChapelle v. Mitten*, 607 N.W.2d 151, 159 (Minn. App. 2000), *review denied* (Minn. May 16, 2000). For all of the above reasons, we conclude that the district court did not err by concluding that the homestead exemption is applicable despite Kerry's inequitable conduct.

## III.

Finally, Mark argues that the district court erred by determining that his contribution toward improving the property does not fall within an exception to the homestead exemption. We agree.

The homestead exemption contains two distinct exceptions for: (1) debts incurred for work or materials furnished in the construction, repair, or improvement of the homestead, and (2) debts incurred for services performed by laborers. Minn. Const. art. I, § 12; Minn. Stat. § 510.01.

Here, the district court ordered the entry of a judgment of $29,990.94 for the total cost of renovation labor, excluding Mark's own labor. Mark argues that this amount may be recovered through the seizure or sale of the homestead under the second exception— the laborer's exception—because he, "in essence, was acting as a general contractor on

the [p]roperty."[1] But the term "laborer" as used in the homestead exemption statute means "a blue collar, manual worker." *Luna v. Edel*, 417 N.W.2d 308, 311 (Minn. App. 1988), *review denied* (Minn. Mar. 23, 1988). The district court did not err by determining that Mark's act of paying contractors to renovate the property does not constitute manual labor.

Mark also was awarded a judgment of $122,818.88 as reimbursement for his payment of the total cost of renovation materials. The district court concluded that this expense does not fall within an exception to the homestead exemption because, as stated in *Luna*, "[t]he labor exception also requires that the laborer's claim be for labor or service performed, not for materials or merchandise." *Id.* (quotation omitted). But the district court conflated the two exceptions. *Luna* addressed the second exception regarding a laborer's claim, and the district court is correct that a laborer's claim must be for labor or services performed, and not for a laborer's materials or merchandise. *Id.* Where a creditor is not a laborer, but a person who provides "materials in the construction, repair, or improvement" of the homestead, the first exception allows the seizure or sale of homestead property under legal process to the extent of materials furnished.

Under these circumstances, where Mark has a constructive trust on Kerry's interest in the real property and a judgment against Kerry for the improvements to the

---

[1] The district court determined that Mark "never filed a mechanic's lien and is foreclosed from doing so at this time." Mark does not challenge this determination on appeal and Kerry did not file a brief on appeal. Accordingly, we do not address whether Mark, who resided and had an interest in the homestead at the time of the improvements, was entitled to a remedy under the mechanic's lien statutes under Chapter 514 (2012).

real property, he is not limited to filing a mechanic's lien in order to recover his judgment from the proceeds of the seizure or sale of the homestead. Significantly, neither the constitutional provision, Minn. Const. art. I, § 12, nor the homestead exemption statute, Minn. Stat. § 510.01, make any reference to the mechanic's lien statute. And, in *Nickerson v. Crawford*, 74 Minn. 366, 368, 77 N.W. 292 (1898), the supreme court rejected the contention that either the constitutional provision or the homestead exemption statute limited the remedies available to a creditor who fell within an exception to the homestead exemption. The court explained:

> Neither by the constitution nor by any statute is the creditor restricted to any particular form of remedy for the collection of his debt out of the homestead or other exempt property. The constitution leaves him to seize and sell it the same as he might any other property under the general statutes of the state, which would be by obtaining and docketing an ordinary money judgment, and then selling the property on execution.

*Nickerson*, 74 Minn. at 370, 77 N.W. at 293. The court reiterated this principle in *Wallace T. Bruce Inc. v. Najarian*, 249 Minn. 99, 104–05, 81 N.W.2d 282, 291 (1957) (holding that the effect of the constitutional provision "was to place exempt property upon the same basis, as to liability for debts of the owner incurred in its improvement or repair, as other property") and *Mortgage Associates, Inc. v. Duax*, 282 Minn. 47, 50, 162 N.W.2d 363, 365 (1968) (concluding that, "with respect to liability for debts of the owner incurred in improvement and repair of the homestead, these [constitutional] provisos place the homestead upon the same basis as other property").

Because the district court determined that Mark directly incurred, and was awarded a judgment for, $122,818.88 for his payment of renovation materials and had a

14

constructive trust on Kerry's interest in the homestead, it erred as a matter of law by concluding that, because of the homestead exemption, a receiver could not be appointed and Kerry's homestead cannot be sold for the payment of this debt. Accordingly, we reverse the district court's denial of Mark's motion for the appointment of a receiver and remand for the district court, sitting as a court of equity, to reconsider such motion under Minn. Stat. § 576.25 and its general equity powers. On remand, the district court has broad "discretion in receivership proceedings to do what is best for all concerned." *Minn. Hotel Co.*, 495 N.W.2d at 893.

**Affirmed in part, reversed in part, and remanded.**